Good morning and may it please the court, Judith Hagley from the Department of Justice representing the United States. I'd like to reserve three minutes for rebuttal. Please keep track of your time. Yes, Your Honor. The central issue in this case is whether a taxpayer can have cost basis in property that he's not required to pay for. The property at issue are membership interest and mutual insurance companies and the issue arises in the context of determining gain on the sale of demutualization stock. Now three courts have addressed the taxation of demutualization stock, Fisher, Dorrance and Rubin, and each of those courts took a different approach. Rubin, we submit, took the correct approach because it remained focused on the relevant issue, which is whether the policy holders were required to pay for the stock and once it determined the policy holders were not required to pay, determined that the basis in the membership rights is zero and the carryover basis in the stock was also zero. Counsel, help me with something. I understand the government's position and I understand the regulation about the presumption and so on and the burden of proof, but here you have a company, it's a mutual benefit company to the degree anybody owns it, it's the policy holders. Now they make a decision to demutualize. Clearly, there's a legal obligation under the laws of Canada or the United States, wherever we happen to be dealing with, to retain a certain amount of money in an account or accounts to meet the expectations to pay the benefits under the policies, et cetera, et cetera. But there's something left over. Now some of the cases refer to that as a divisible surplus, but however you count it, it's a lot of money, there are probably buildings and cars and all kinds of other things and someone owns those. When the demutualization occurs, my understanding is that the owners become the shareholders. Now before demutualization, everyone seems to agree, you really can't value it, it's kind of inextricably intertwined, the service seems to agree with that, the policy holders agree as well. But once the demutualization takes place, you've got shareholders and those shareholders own whatever's left. Now the voting rights may be a little different than they might normally be in a straight out common stock equity situation, but whoever owns something, it's those shareholders. Those things they own have a value. The question is how do you calculate it? Now in the first case here we're dealing with, the district court applied a formula based upon expected future income stream, discounted it I think by like 60%. The other case that we're going to deal with next has a slightly different situation, but the reality is there is a value there. It's not always easy to determine, but it's not like this is some will of the wisp that no one can determine. It's difficult in the sense that the market has a certain value to it, other people have different values, but it's not like after the demutualization it's incalculable. I mean it's clearly calculable, is it not? It is calculable after demutualization and prior to demutualization there's testimony in the record that you can determine the value of the membership rights. The membership rights prior to demutualization provide no economic value to the membership. But is that what we're looking at though, with respect? No your honor, we're looking at what they were required to pay and this is the distinction between basis and value that the courts emphasize in tax cases including this court's decision in Coleman and the Fifth Circuit and Better Beverage. Basis is what you're required to pay, not what the value of the property is, not what you would be willing to pay. Well let me ask you this, each of the shareholders got whatever they got because they had a policy, they made payments on it. Without having been a policy owner they would have gotten nothing, right? That is correct. Okay, so in this case if they are entitled, if they continue to make the premium payments on the policy that when whoever the covered person is dies then there's a payment. But there's more in the policy. It's almost impossible to calculate it when it's tied together with the policy. Once that is no longer the case, there's clearly a value. I mean you can say well all they paid for was the premium and the premium's the same before and after. But the fact is as you agreed, if they hadn't paid anything they wouldn't be entitled to be shareholders and the shareholders own something, the market says they own something. So admittedly a little tricky but we can't just say they pay the same amount whether or not it's demutualized therefore they have no basis. But that is how you calculate basis. For example after this court's Gladden decision to determine the cost basis and property that was inseparable when originally acquired, you look at the cost of the property with that additional right versus the cost of the property without it and if the cost is the same then nothing can be allocated to that additional right. Doesn't Gladden, doesn't that really arise from a very different factual situation though? Well there was an additional fact of initially the court was looking at whether an unvested right, like the what are rights in that case, could be allocated basis and the court said that in certain situations in the situation in that case an unvested right could be allocated basis in the same way that a vested right could be allocated basis. And so in that sense the cases are similar because the membership rights had vested at the time that the members had brought the policy. But what's key is that the premiums did not change and it's undisputed that the members had been paying for the membership rights. There seem to be two different things we're talking about. One is what was the value of this, the things policyholders got aside from the insurance. What was the value of that? The second thing is what did they pay for that? For the purpose of establishing the basis isn't the issue what did they pay? That's exactly right, Your Honor. That's exactly right and that's why the Rubin Court got it right because it focused solely on that issue without regard to value. And the undisputed testimony in this case from each of the executives from the companies and the government's expert Ralph Sayre is that mutuals do not charge their members for the voting and liquidation rights. Whatever their value they are not charged for it and if you are not charged for something you have no basis in it. The reason they have no value is because they're inextricably intertwined with the policy while there's a mutualization. This is where the problem that open transactions comes in. If we were dealing here with valuing the asset and determining basis and they were still intertwined then that doctrine may very well apply. But here it no longer applies and what was impossible to determine at one point suddenly has a value. The question is what is it? Now obviously as you indicated earlier if they hadn't paid the premium they wouldn't be entitled to anything. So they got something in addition to the policy for the payment of the premium. So the question is what is that? How do you calculate that? I guess that's in the Rubin case you fix a certain value then you took it away. But the market immediately has a value for these shares when they came out. What role if any should that play in just the value part not the basis part but the value part for the moment? But your honor the value is irrelevant in this instance to the basis question and that is the question before is what is the basis? Well I understand your position but what I'm saying is if they don't get the stock at all if they haven't paid then some portion of what they paid yields the value that they get. Now how you get to that is the issue that I think we're talking about here but it's not like all of the money that they paid in just went for the payment of the policy and nothing else right? No the testimony is that's exactly right. All the money that they paid in was calculated to cover their contract rights. The fact that they had to have a policy as a predicate to get the stock doesn't mean they paid for the membership rights they exchanged for the stock and the case I would tell you to look at as analogous is the Better Beverages case. So there the buyer purchased a company and bought the business asset and also acquired as part of that deal a covenant not to compete. The buyer would not have received the covenant not to compete but for the fact that it had purchased the company but the seller didn't charge the covenant not to compete and therefore the 5th Circuit held the buyer had no basis in the covenant not to compete just as the policy holders here they had to buy a policy in order to get the membership rights but there was the seller. But that was based upon the way they structured the deal because normally a covenant not to compete can even be written off over a period of time if you structure it properly isn't that correct? If there had been a charge there was no charge in that case. Well is it the charge or is it the way you structure it? It was the fact that the analysis of the court was there had been no charge for it. It was all part of one contract but that's what the court said. It's certainly possible in many circumstances that how you structure it determines. I mean they could have structured the insurance by saying alright you pay $1,000 a month, $900 goes for the cost of the insurance, $100 goes for the cost of your other benefits and we wouldn't have a problem. They didn't say that so had they structured it that way it would have been easy but they didn't and so we now have to figure out is was there a charge in effect for those other side benefits. And we know that there wasn't because the company said that there wasn't. There's no evidence that there was a charge. The premiums did not decrease after the mutualization. The undisputed testimony is if there had been any charge for the voting and liquidation rights the regulators would have required the premiums to decrease and they simply did not and then step back and look at the internal revenue cut. Wait a minute, wait a minute. I thought what the regulators required was that they get certain monies and that they get the stock because there was value, because of the accumulated surplus. Am I missing something? Because they were required to get the stock because they were giving up the voting and liquidation rights. Right, that has value. That has value. Not because they had paid for that. Again this gets back to the distinction between basis and value and as the companies told the policy holders prior to the mutualization those membership rights provided you no economic value. I think they're somewhere we're referred to as the value of the market. But we're chasing our tail here because I thought you agreed if they hadn't paid the premiums they would not get any stock. And yet you say if they get stock it doesn't matter what the stock is worth their basis is zero. I don't get that. Because the stock was received in exchange for the membership rights and there had been no charge for the membership rights. But when the membership rights are integral to the nature of the mutual policy that they purchased in the first place, why isn't it tied up? And then when you decouple it you have a different situation. Look at the concept of what the mutual company is. A mutual is a bunch of members who agree we're going to provide insurance at cost. And when you calculate the premiums you look solely at the contract rights of how much to provide, the death penalty, the voting and liquidation rights has no cost to the company. Why would the members charge each other for that? That's consistent with the fact that the executive said we do not charge for that. It is a right that you get by operation of law. We only charge for things that cost the company. These rights don't cost. There is no cost, no portion of that premium that is allocated. But with respect, counsel, you're talking about the situation before the demutualization takes place. But let's just say hypothetically that the company didn't demutualize, but it liquidated. Who gets the excess cash and the company buildings and the cars and all that stuff? The policyholders, right? If there were solvent liquidation, but your honor, that is a theoretical right. As the Supreme Court said in Society of Savings, mutuals do not liquidate solvently. There's never been a solvent liquidation and in Canada it was illegal for there to be a solvent liquidation. That's why it's referred to as a theoretical right. It never happened. But you're saying that it's impossible for an insurance company to liquidate. You're saying just a mutual insurance company to liquidate. I'm saying anything can happen, but it's almost impractical, which is why the Supreme Court in Paulson, when it said it was valuing the equity interest of a mutual member, said the value was practically zero. Can I ask you a different question, which goes to the tax code? And you made an argument that Section 72E by its wordage suggests to you that if we were to take the position that the taxpayer wants us to take, that that would be actually in contravention of the tax code. So I'd like to hear your argument on that and then I have some further questions. Sure. We've made the point that viewing the policy premiums of being paid solely for the contract rights and not for the membership rights is consistent with the way Congress taxes insurance companies and the policyholders. Congress treats all of the premiums as being paid solely for the contract rights from the point of view of the company. It's all income. No portion is treated as non-taxable contributions to capital or payment for an equity interest. And from the point of view of the policyholder, Congress treats all of the premiums as being paid for the contract rights such that when the policy member receives a payment under the contract, Congress allows under 72 all the premiums to be applied to that contract right. And the Dorans has experienced this first hand in 2010 when they cashed out their Phoenix policy. So let me ask you about that. When they cash out that policy under Section 72, they're permitted but not required to take advantage of that section of the tax code, correct? I mean, you don't have to take advantage of any part of it, but that is the design. They are entitled to all aggregate premiums apply it to, which is how Phoenix reported the distribution to the IRS. They received 1.9 under the contract. They had paid 1.5 in premiums. And so 400,000 was what was reported. No portion was held back for membership rights. So I understand that underlying this, you'd be saying you can't take advantage of that portion of the tax code and then come over here and basically, I don't know if you want to call it double counting, but basically inflate a basis when you've already done this. Double use of basis. Double use. So then my question would be, couldn't they go back if the taxpayer is correct that it's possible to give some basis value to this transaction? Couldn't they go back and simply file an amendment? Wouldn't that be the solution? They could do that, but this puts, I mean, this creates anomaly in the code and it puts the IRS at litigation risk of taxpayers not doing that. Saying under the code, we're entitled to apply all our premiums to our contract rights. Right. But if we are entitled and we did, but now we're in this other situation, which we didn't know about in 2010 exactly when we did this. So we're going to be square with you and file an amended return and come up roses basically is what they would say. So they could do that. And if they do that, then the tax code wouldn't be running into itself like you're suggesting. They could do that, but the service is at risk that taxpayers are not in fact going to do that. Well, but you're at risk every day, at least as of next week, that people won't even pay their taxes. So I'm not quite sure what that means. But we're just, our only point is, is that our interpretation of our position in this is that premiums are paid for the contract rights and not for any sort of equity interest. But with respect counsel, I think most of us that have followed this over the years realize the insurance companies have had some wonderful lobbyists that have found a way to shelter all these premiums and build up all of the equity, almost like it's a giant 401k. But we're talking about not what happens with the money and how it's treated from a tax position with respect to the policies as policies. We're talking about what happens when the company changes its structure. And I view this as being very different than the umbrella of how the premiums are treated for policy purposes. So I'm troubled with the idea that there's just no value here. I know you say value and basis are the same thing. But they are distinct. They are distinct. I understand they are distinct points, but the reality is there would be no value or right to value if they had no basis in it, if they hadn't paid for it. If they hadn't paid the premiums, they wouldn't get anything. The question is, is there a portion of the premium that is a basis in what they get? And that's, of course, you dispute the fact that there is any basis. Because the company said, we are not charging you for this right, and therefore they have no basis in the right, which is why the courts like the Sixth Circuit and Bank of New York and other authorities refer to demutualization benefits as a windfall. They're receiving stock in exchange for membership rights and unexpected reorganization when they hadn't been required to pay for those membership rights. Nothing wrong with getting a windfall. It's just taxable. And it's taxable. It's taxable. Yeah. I mean, the authorities are consistent on it. Well, they're saying it's taxable. They're just saying it's less taxable. You say there's no basis. They say there's some basis. Well, I guess one of them. One of them. They say there's a whole thing. Yeah. Then there's the open transaction argument. Zero basis. You don't talk about this with your significant other over dinner, do you? All the time. I'm sure. May it please the Court, Todd Welty for the Dorances, and I would like to reserve three minutes for the reply to the cross-appeal that the Court allows. Starting with where your questions began, and that is, were the Dorances required to pay for the mutual rights? Yes. The Dorances, in aggregate, paid more than $15 million in premiums. Had they not done so, or anywhere along the way, had they stopped paying premiums, the mutual rights would have lapsed. It is inconceivable that they did not pay something out of that $15 million in premiums for the mutual rights. The question is not whether they paid something, but how much. Let's stop with whether they paid, because I don't think you can quite so lightly skip over the services argument that the way these were structured and what they were told is that you're not paying anything for any additional rights. Paying your premium policy, that's it. So what is your response to that? I mean, that's what they were paying for, they paid, and end of story. That in fact is not the evidence and not what the Court found. The Court found that the mutual insurance companies generally sold policies with the owner a mutual policy, this is a mutual policy, and you are in part an owner and we operate this insurance company for your benefit. That was part of the sales pitch. But that doesn't answer the question of disaggregating what they're paying for what they're getting. Disaggregating, yes, and the government points to Better Beverage, among others, as the basis for saying you can't, they didn't charge, the insurance companies didn't charge anything. Judge Allegra at the Court of Federal Claims dealt with this very thoroughly in his opinion, but turning to the Better Beverage case, that really turns on a unilateral statement by one side of a transaction as to the value of a covenant not to compete. There were no discussions in that case among the sides as to what value, if any, should be assigned to that covenant not to compete, in part because it would have revealed the divergent tax treatment on each side, there was sort of a competition, so you remain silent during the negotiation of Better Beverage, each side takes its position and the government is simply a stakeholder saying, wait a second, we're being whipsawed by both sides. But to the point that I made to your colleague on the other side, that's a matter of structure, right? If the parties had structured the Better Beverage transaction differently, there would have been no question that there was basis in the covenant not to compete and no question that under certain circumstances, the payor could deduct those costs. Correct? Correct. And in contrast here. And the same is true here. If you had structured your deal saying you're paying us $1,000 a month, $900 is for the benefits you're going to get because of the form of the insurance company, if you'd structured it that way, we'd have no problem. So of course it's structured, that's the easiest solution, but there is no structure. There's a single payment and the question is, how much of any of that is for the incidental benefit rather than for the insurance? Correct. And unlike Better Beverage, where there was no discussion, here we have an entire statutory regulatory framework protecting that right. You have actuaries studying what is that right worth. You have investment bankers rendering fairness opinions. You have regulatory approval. And finally, a vote by the policyholder so that not only are both sides agreeing on,  That's post after I bought this and paid my money. So as I brought up with the IRS, and you know, your clients took advantage of Section 72 and in doing that, there was no attempt to say, well, only a percentage of this is really eligible for this offset or deduction, right? Candidly, Your Honor, I don't know.  And that was raised for the first time on brief, on appeal. Conceptually. We won't take your client, we'll take a hypothetical mutual policyholder who takes advantage of Section 72 and in doing that, the way it's structured with the IRS, there's basically this complete offset, right? No, Your Honor. At a conceptual level, there is and should not be a double dip, if you will. To the extent that there is an allocation of the premium payments to the basis of the mutual rights, it would be a dollar for dollar reduction in the basis in the insurance policies. I acknowledge that there's a 1099 in the record that doesn't report it. We're not going to talk about your clients right now, but if a taxpayer holds policy and you surrender the policy, then under 72, you can reduce the taxable gain, correct? You can reduce the taxable gain with the basis in the insurance policy, which if that portion of that basis is allocated to the mutual rights, it would not be double counted. No, no. Okay. That confuses me because I don't see that in Section 72. That's where I'm ... I don't understand that. One of the ways that ... I mean, do you have any authority that says that the way they do it is that they basically split up the premium right from some kind of other allocable ... I acknowledge, Your Honor, that 72 does not address this on its face. Okay, so then let's just go back to 72 and where Congress says, look, if you have a situation where either you pay tax on your dividend or you surrender your policy, then you can reduce your taxable gain, correct, by your premiums? Yes, and one of the ... And the premium is this total amount we're talking about now, a portion of which you would like to allocate to a basis down the road, correct? Yes, Your Honor, and one of the ways that basis is calculated under Section 72 is the dividends received. Right. The dividends received is a return of a portion of the surplus inside the insurance company, which is exactly what the mutual policyholders are being compensated for in the demutualization. So it doesn't produce an anomaly. It is a variation on the reduction of the basis in 72 for dividends because it is a return of surplus. And in fact, the court here at the trial focused very much on the return of that surplus and how is it calculated. Pre-trial on the competing cross sections for summary judgment, we argued open transaction doctrine. The government argued no cost basis. At the record at page 71, the court ruled when looking at the insurance company side that a dividend, if you will, is treated as a deduction against the insurance company's income. In other words, it's a return of what would otherwise be retained earnings or a portion of the surplus. And the court was troubled by the way the refund claim was structured, and that is the we should have neither gain nor loss on the sale of the shares we receive as a part of the demutualization. And the court recognized, well, wait a second. Through the demutualization, you are being compensated through the date of demutualization with the shares. There is some post-demutualization gain or loss built into this of approximately $450,000. And that calculation is actually in the record at 77, option number 3. It's approximately $450,000 in the aggregate. And the court was somewhat troubled by that and therefore denied our open transaction claim. One of the ways to solve that, which we acknowledged pre-trial, is option number 3 at record on 77 was you treat the basis recovery through the date of demutualization. In fact, that is the primary distinction between what happened in the Fisher case and what happened here. In Fisher, the taxpayers sold the shares they received as a part of the demutualization in the IPO. Well, they got cash, right? They got cash. Yeah. So there was no post-IPO gain or loss, and everything they received could be attributed essentially to the surplus that they, as mutual policyholders, were the owners of. Here, the Dorrance is held on to the shares post-IPO. I don't understand what difference that makes as far as how much they actually paid for these benefits as opposed to for the life insurance. What difference does it make whether you take the cash or whether you take the stock and sell it? That doesn't change the question of how much did you pay for it, which was your basis. Yes, Your Honor. One of the aspects of this is how was this share allocation determined? How was it determined? In all but the Sun Life case here, which used a slightly different method, as testified by the government's expert, the actuaries and the investment bankers looked at two different things. There was a fixed component. That was the vote, the right to vote that they were compensated for. Mr. Sayre testified that's roughly 20 percent, though the detailed evidence in the record shows more specific numbers. And then there's this variable component, and what were they looking at? And the record, as testified by Mr. Sayre and found by the court, is that the actuaries, the investment bankers, were looking at what did this particular policyholder actually contribute to the surplus through their premium payments? You step back a little bit, what are you talking about? What did this shareholder contribute to the equity value of this company by making the premium payments? So when they get it back, they're essentially getting back the equity, the amount that they through their premium payments. Could I just stop you there, because maybe my question reflected some misunderstanding. I thought that we were looking at how much of the amount they paid for this insurance plus the benefits was attributable to these side benefits. Now I understand you to be saying how much of what they paid is attributable, how much of what they paid produced the benefits to the company. Is there a difference between those two? The difficulty is with the lump sum payment upfront. It is virtually impossible or impractical to use the court and Gladden's terminology on the remand. Is that impossible or impractical to disaggregate because they're inextricably intertwined? And if so, you go to a basis recovery method, which is the open transaction doctrine in the Supreme Court case Logan or in Inaja Land Company, which is what the Gladden court pointed to. In fact, the Gladden court would have described this case as one of the easy scenarios. We had vested rights in the mutual insurance company at the time we paid the policy. You just couldn't disaggregate those rights to tell how much you paid for the insurance versus how much you paid for the mutual rights. And therefore, the only question is, can you use equitable apportionment under the regulations under Section 61, or do you use the open transaction doctrine? We contend that you should use the open transaction doctrine, and why? The record here demonstrates that how difficult it is to come up with a value or a breakdown of what you paid for the mutual rights versus the insurance policy. It's impractical or impossible, which is a terminology, or you can't determine it with anything like fair certainty is other terminology, and in fact, I think that's what happened here. And quite candidly, one of the reasons the court, at the end of the day, ruled that we had waived a portion of our argument, because it caught itself coming and going. Well, wouldn't you also, I mean, doesn't that sort of tie into the IRS's argument that really they're, your argument is you just can't figure it out, and that's why you need the open transaction doctrine. And they're saying, well, you can't figure it out because there isn't anything to figure out. Nothing was paid for this. So it kind of loops back on itself, doesn't it? And moreover, isn't the service correct that if you can't figure it out under Coleman and the reg cited there, if you can't show what your basis is, it's zero? That's their argument, I gather. I think that's their argument, and I think that in Fisher, at page 797, the Court of Federal Claims dealt with that well. If that were the case, if it's just too speculative, you can't tell what it is, as the court pointed out in Fisher, well, then there would be no reason for any open transaction doctrine case because that's the fundamental presupposition in open transaction. Open transaction doctrine is, by its term, it's supposed to be exceedingly rare. It's a real windfall, depending on how it's applied. In this case, the judge seemed to have tried very, very hard to balance this, take everything in. And as I understand it, we review what the district judge did for abuse of discretion, do we not? Your Honor, whether you refer to this... In terms of the calculation, that's what I'm talking about. The calculation would be clear error. Okay. And what we would say here is, under whatever standard you review it under, is the largest policy here was prudential. And as noted at page 79 of the record, prudential itself said, when calculating what the policy holders are entitled to, you should not only look at past contributions to surplus as of the calculation date, but future contributions between the calculation date and the IPO date. That's the 60% figure, right? Yes. 60% was for past contributions, 40% is between the calculation date and the IPO. Prudential itself in the actuaries said, ignoring estimated future contributions after the calculation date would clearly produce an unrepresentative result. These are the insurance companies themselves. Now, what happened and how did we get to this 60-40 split? Just a little bit of background into the trial. What happened at the trial was, after the examination of Mr. Sayre, the court took over questioning. And as the court questioned, Mr. Sayre talked about the variable component dealing with contributions to surplus, and the court said, well, how did they break that down? Sayre responded, what do you mean breakdown? And the court said, between past and future contributions. And Sayre gave a rough estimate, as he termed it, of 60-40 past contributions, 40% future contributions, and then he went on to testify about it. Hesitantly, I stood up and objected to the judge's questions and said, your honor, this is not disclosed anywhere in the materials by the insurance company or in Mr. Sayre's report. It came out of the blue. The court initially sustained the objections to its own questions, struck the 60-40 because there was no advance notice. Later on, the court came back and said, are you sure you want to object to that? The objection was at record 15-16-17, court comes back and says, are you sure you want to object to that? Well, you withdraw your objection at 15-82 in the record. We withdrew the objection, but the court then said, at the end of the evidence, obviously the computations had not been done on the 60-40 split. What is that number? Does that produce? The court clearly said that contributions post-calculation date and pre-IPO date may add to the basis. Clearly in the record. Is it your position that there was clear error by the district judge in his calculation? I would say at that point, either clear error or it's a mixed question of fact and law at that point. But under either standard, the court acknowledges in the record that payments between calculation date and IPO date would increase the basis. But at that point, since you waived or at least withdrew the objection, the 60-40 is evidence in the record, is that right? Just to the 60-40, yes. Yes, and the court then went on to say that we could provide computations and argument that he would accept post-trial, essentially do the math for me and send it back to me. I haven't reviewed the record and I'm not inclined to do so. Point me to the existing record and do the math, which we did. And it can't be said that the trial court didn't have the opportunity to review it or that we somehow waived that, as this court noted in Kornhusker Casualty Insurance Company at 553 F. 3rd, 1187, 1192, an issue is not considered waived if it has been raised sufficiently for the trial court to rule on. What would that change? I suppose you would correct on this. What would the effect be? The effect is, as we pointed out to the court, and I think this is why the court jettisoned it, is that when you do the math, it actually produced a net long-term capital loss, which is something we didn't even ask for. And so when you do the math under the 60-40 as recommended by the court, it actually produces a basis larger than we requested. And we pointed the court back to either the open transaction doctrine or a basis recovery, which is essentially open transaction doctrine, option number three at record 77, which produces a basis equal to the IPO value. And then there would be a net gain of approximately $450,000 for the post-IPO fluctuation in the stock price. With that, I have about a minute left. Actually, you're over time. Okay. Thank you, counsel. We'll give you, how much did you want? Three minutes? I don't think I saved it. Actually, I could just make two brief points. Go ahead. Yeah, we'll give you a couple. With regard to the equitable allocation that the district court did, to respond to Judge Smith's question, we believe that the court should be viewed as de novo because the court erred as a matter of law. If you're going to use value to estimate costs, you need to look at the value of the property when it's acquired, not when it's relinquished. We cite a number of stories, including Gatton makes that point. So this is back to the conversation we had earlier, value is not basis. Exactly. This is our alternative. Right, I understand. And under the circumstances, if we accept in the context that we're using it that you are right, then of course the judge would have erred as a matter of law, right? Right. Right. Right. And just looking at the allocation itself, two main flaws, which demonstrate why it wasn't equitable. Number one, it ignores the dramatic transformation, undisputed dramatic transformation of the membership rights from the time they were acquired to the time they were relinquished. Both experts agreed to that. Illiquid temporary assets were transformed into permanent liquid ones. Also, it ignores the undisputed fact that at least 90% of the surplus that the stock represented had been contributed by former policyholders. These companies had been in existence, you know, for 100 years, and much of that surplus was created by former policyholders. But arguably that could be true. Admittedly, value basis are different from your perspective. That would be true of almost any company though, right? Be it an insurance company or whatever. I mean, you could have one that's been around for years and years and years, and other people may have made contributions, invested, whatever. But they still have that. Now, again, that gets back to your basis and value. If some portion of the premium is basis, then that reduces the amount of taxable gain. What we have to wrestle with is whether, from my perspective, is whether the service is corrected. Just across the board, we have to totally discount the value when we consider the basis. When you have stated, and I agree with you, that if they had not paid any premiums, they would have got no stock. They would have had no rights at all. It's worth something. They have paid something to get something. But how that works is the issue here. Right. The Supreme Court has said it's worth practically nothing. The court said that in Paulson. Easy for them to say because they make more than we do. And, you know, for generations, policyholders had paid premiums for a policy and received nothing. And so on that point... Other than their contract, like... Sure. In case they... Right. ...need to collect on it. But on that point, one of the things that the Norrences rely on here, of course, is that the insurance companies themselves, when they were going in and making actuarial allocations, they claim, in fact, that there is, at that point, an acknowledgement of some component for voting or other, you know, intangible rights. And, therefore, the way that they were even valuing the transaction was giving not only a value, but it would mean they would have paid some portion of their premium for that value. So what does the service say to that argument? Well, there's nothing in the demutualization plans in the record where they're saying that they're getting the stock because they paid for the membership rights. There's no discussion of that. The stock is not designed to be an estimate in any sense of what they paid. They're just... The regulators have required the companies to provide the entire value of the company to its current policyholders and actual contribution memos. The work that they did was trying to... How are we going to divide up this windfall amongst the current? You say that there is material in the record that shows that they were not paying for anything other than the policy. Right. It's the testimony from both the government expert and each of the executives said that when we calculate premiums, there is no charge for the membership rights. Premiums are calculated solely on the basis how much is it going to cost the company to provide these contract rights. And is there something that is told to the purchasers that says you are not paying anything for those additional rights? No, unless the purchaser asks. What the purchaser knows is that they get these rights as a matter of law. They know that these rights are not even discussed in the policies, and they know that they are not getting the economic value from these rights. So why would they think that they are being charged for it? Is there anything publicly disclosed by the companies that says that? Not at the time, but it was public information during the trial that they were not charging for these membership rights. When the people bought the policies and paid, there was nothing that told them whether they were or were not paying part of the amount. They would know that the Internal Revenue Code treats all the payments as points to contract rights and not to any membership rights. I'm sure that all the policyholders were very familiar with that. What else do you read in your free time? But also let me ask another question. Is there anything from a regulatory, an insurance regulatory standpoint that required them to only accept as a mutual company premiums for the policy right? What FAIR, the government's mutual expert, said is that in computing your premiums, you have to be very specific about your cost. You have to identify your cost. And if it's not an identified cost, then your premium can't provide for whatever that is. And there's no evidence that an identified cost was some additional issue or component. That's undisputed. Thank you. Yes, Kevin. I thought you wanted three minutes, but we'll give you two. If I've got my three minutes, I would be glad to take it. Just in response to the last statements, policyholders don't know they're buying this. Finding effect number four, a typical purchaser of a life insurance policy from a mutual company understands that by virtue of buying a policy, he or she becomes an owner of the company. The possession of mutual rights was a typical selling point to potential policyholders. Finding effect by the court. Along the same lines, was anything paid for these rights? The government's own expert, whose testimony the court rejected as not credible when he said there was no value, he did at least testify as the IPO approached. The mutual rights gained value the closer you got. Between the Tick Prudential, the largest insurance policy at issue for the Dorrances, $12 million total premiums paid from the date of acquiring the policy through the IPO. Four million of those were through the calculation date. Eight million dollars premiums of pay between the calculation date and the IPO date. It is that additional eight million dollars of premiums that the trial court ignored when calculating the basis. That gets back to what your colleague on the other side talked about, which is value versus basis. I assume she would say, well, sure, you get closer to the IPO, the market looks for certain things, and that's the value. That's great, but that doesn't explain why that should translate into basis. What you said, though, about the finding of fact may be a different issue, though, because there seems to be some sentiment in the literature and the cases that if there is absolutely no expectation that it's ever going to be demutualized, there'll be no value, that that somehow plays into whether there's basis. In other words, it's almost an expectation aspect. What's your comment about that? Well, as of 1996, cited in the record, ADD 126 is an article noting that demutualization is possible in all 50 states as of the date the policies were acquired. In fact, the record is there had been a series of demutualization by the time the Dorrances first bought their policy, and certainly by time of the demutualizations or the IPOs here, and during the period during which the Dorrances were paying millions and millions of dollars of premiums, a wave of demutualization swept the country. That really seems like a very odd argument. So what that would do if that argument holds true is you'd have a series of policyholders who bought their policies in the 50s or whenever they bought them. There were no demutualizations. There was no sweeping of the country. And then all of a sudden, presumably they had no expectation, and you're saying, but your clients had a potential expectation. I'm having trouble with that argument. You're exactly right, Your Honor. We have argued consistently that under Gladden, our rights vested when we first paid them. Day one. Day one. But so did the people who bought their policies way back. Right. This goes to the Gladden in-between thing. So what does this argument have to do with anything then? Just responding to the court's question about it. You're responding, but you're acting as if there's some sort of a consumer reliance situation, and I don't think that's been injected into the case up to now. No, Your Honor. Okay. This is simply a response to the government's argument based on the in-between case in Gladden or the hard case in Gladden. We've always contended where the easy case in Gladden, the government has postured that we had no expectation of demutualization. And the response is, well, clearly it was legal in all 50 states, and there had been a series of them before 1996. And between 1996 and the actual demutualizations during this time period, my clients paid $15 million of premiums in the aggregate to acquire, yes, insurance, but also acquire and maintain ownership of those mutual rights. Did your clients, when they got dividends, offset any premiums they paid against that to reduce any tax? Your Honor, just quite candidly, I don't know that. That is how the basis is calculated. That's how the 2010 issue came up somewhere. Yes, Your Honor. Your Honor, when Phoenix sent out the 1099, it did not take into account the argument that we've made in the claims of the refund that we're entitled to a portion of that basis not upon termination of the policy, but as a part of the basis of the stock. Obviously, if that were done, and I don't know whether it was or not because I couldn't see it in the record either, but if that were done, you couldn't double count that. If there is a basis, it would have to have been reduced by the amount that was applied toward any dividend payments. We have never argued and would not maintain that there should be a double dip on basis. Okay. Thank you, Your Honor.
judges: Reinhardt, McKeown, Smith